# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-424

**STATE OF LOUISIANA**

**VERSUS**

**JOSHUA X. GRIFFIN**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 81423
HONORABLE C. ANTHONY EAVES, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**DAVID E. CHATELAIN\***
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Marc T. Amy, Elizabeth A. Pickett, and David E. Chatelain, Judges.

**AFFIRMED.**

---

\*Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Joshua X. Griffin**

**Asa A. Skinner**
**30th JDC District Attorney**
**Terry W. Lambright**
**First Assistant District Attorney**
**P. O. Box 1188**
**Leesville, LA 71446**
**(337) 239-2008**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Joshua X. Griffin**
**Louisiana State Penitentiary**
**Angola, LA 70712**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Joshua X. Griffin**

**CHATELAIN, Judge.**

The State of Louisiana charged Defendant, Joshua X. Griffin, by bill of indictment with the first degree murder of Jason Perry (Perry), a violation of La.R.S. 14:30; conspiracy to commit armed robbery, a violation of La.R.S. 14:26 and 14:64; and armed robbery, a violation of La.R.S. 14:64. Thereafter, the State filed a notice of intent to not seek the death penalty. On August 15, 2015, a jury returned a verdict of guilty on each charge. The trial court subsequently granted a Motion in Arrest of Judgment and dismissed the armed robbery conviction.

On September 25, 2015, the trial court sentenced Defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on the conviction of first degree murder and three and one-half years on the conviction of conspiracy to commit armed robbery, to be served consecutively. Defendant now appeals, raising four assignments of error through counsel and six assignments pro se.

## FACTS AND PROCEDURAL HISTORY

Around 9:00 p.m. on April 13, 2011, Andre Porter (Porter), Dontrez Banks (Banks), and Defendant met at Paul's Truck Stop in Leesville, Louisiana. Sometime around then, the three men discussed going to Perry's residence north of Rosepine initially for the purpose of stealing some marijuana. All three men then proceeded down Highway 171 (Hwy 171) towards Perry's residence in Porter's vehicle. At some point, a text was sent from Banks's phone to Perry, presumably inquiring about the purchase of marijuana.

Very quickly after they arrived at the residence, Perry approached Porter's vehicle, and an altercation ensued between all four men, which resulted in Perry's death from one of seven stab and slicing wounds he sustained in the altercation. Perry's cell phone, wallet, and marijuana were taken from his pockets. Defendant,

Porter, and Banks then left and returned to Paul's Truck Stop, discarding Perry's cell phone and driver's license on Hwy 171 along the way.

Later that evening, Arkie Prosise, a longtime friend of Perry, arrived at Perry's residence around 10:00 p.m. When he turned into the driveway, he saw Perry lying on the ground, unresponsive, and he summoned help. Shortly thereafter, Chief Dennis Parrott (Chief Parrott) of the Rosepine Police Department arrived. After checking for a pulse, he called to ensure an ambulance was en route and to alert the Vernon Parish Sheriff's Office (VPSO) of a possible homicide.

Earlier that day, Perry had contacted Chief Parrott regarding threatening text messages he had received from Defendant. Chief Parrott had advised the victim to obtain the messages and bring them to the station. When Detective Mike Martin arrived on the scene, Chief Parrott told him about the text messages, the printouts of which were recovered from the victim's car at the scene. Also while at the scene, Chief Parrott informed the lead detective, Ray Ortiz (Det. Ortiz), that he was familiar with the victim from an incident that occurred the prior night when he had responded to that same location and taken a report of a busted window in the victim's residence; Defendant was a person of interest in that incident.

Sometime before midnight, Perry's live-in girlfriend, Briana Estrada (Estrada), who was also the mother of Defendant's two children, arrived and spoke with Det. Ortiz regarding threatening text messages she had received from Defendant that she explained were directed at Perry. During her interview at the scene, Estrada showed the detective her phone, which contained the text messages. Det. Ortiz also spoke with the victim's brother, Justin Perdue (Perdue), who told Det. Ortiz about his belief that Defendant would have been someone responsible for his brother's death as he was aware of a confrontation between the two men and threats Defendant made towards his brother.

2

Det. Ortiz reported this information to Chief Detective Marvin Hilton (Det. Hilton) at the scene. Det. Hilton then sent officers to locate and detain Defendant. In the early morning hours, Deputies Jason Horton (Deputy Horton) and John Adams (Deputy Adams) arrived at the home of Defendant's parents, located at 1107 Maple Grove Circle in Leesville, Louisiana. Defendant's father, Carl Griffin, answered the door and granted the officers permission to enter the residence. He then led the officers to his son's bedroom and opened the door. There, the officers found Defendant in bed, apparently asleep and sweating profusely. Deputy Horton then advised Defendant of his *Miranda* rights,[1] handcuffed him with his hands behind his back, and led him to his police unit where the deputy placed Defendant in the back seat. After calling Det. Hilton, Deputy Horton informed Defendant a detective was on his way to speak with him. At this time, Defendant told Deputy Horton that he believed his blood sugar was low. Deputy Horton immediately removed Defendant from the vehicle, uncuffed the Defendant, and recuffed him with his hands in front, which allowed Defendant to test his blood sugar levels. The monitor that one of his family members brought from the residence gave a reading of 37. Defendant's mother then brought some candy and a fruit drink, which Defendant consumed. Shortly thereafter, Defendant stated he felt better. Det. Ortiz then met Deputy Horton outside the Griffin home and instructed him to take Defendant to the station.

Once at the station, the detectives noticed Defendant had a cut on the back of his right leg. Initially, Defendant refused to talk to the detectives, but in an interview around 5:30 a.m., Defendant admitted to Det. Ortiz he fought with the

---

[1] In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), the Supreme Court rendered inadmissible statements obtained from defendants during custodial interrogations without full warning of their constitutional rights as having been obtained in violation of the Fifth Amendment privilege against self-incrimination.

victim the night of the murder, but he denied stabbing or killing Perry. During the interview, Defendant implicated a man he referred to as "Cory." Detective Steven Moss and another officer then took Defendant to find "Cory's" home, but the search was fruitless as Defendant eventually conceded he made up "Cory."

Thereafter, Defendant again asked to speak with detectives. The interview was conducted on April 14, 2011, at 9:09 a.m. and ended at 9:25 a.m. Both the recording and the transcription of the interview were introduced and admitted into evidence at Defendant's trial. During the interview, Defendant stated he knew the victim because he purchased marijuana from him and because the victim dated his ex-girlfriend. Defendant related that he and Porter, along with another friend, went to the victim's home to purchase "weed" or hydro-marijuana. When the three arrived at the victim's home, they asked the victim if they could weigh the drugs. According to Defendant, while the victim was standing outside of Porter's car, Porter's friend hit the victim through the window, and the three guys exited the car and jumped on the victim. Defendant admitted that he hit the victim with his fist multiple times, until the victim fell to the ground, and that he kicked the victim. He indicated the three perpetrators took everything out of the victim's pockets but denied using any weapons. Defendant recalled, when they left the victim's home, the victim was alive. After leaving the scene, Defendant saw Porter throw the victim's phone out of the car. Later, Defendant returned to his home. When asked how he received the cut on his leg, Defendant stated he believed he cut it on a tree.

Defendant was then formally arrested at 10:00 a.m. on April 14, 2011. The information he provided further led to the apprehension of Porter and Banks, who were both interviewed later that day.

Det. Ortiz interviewed Porter on April 14, 2011, from 5:37 p.m. to 5:53 p.m. The transcription of the interview was introduced into evidence at trial. During the

interview, Porter recalled Banks called him and requested that they meet at a truck stop. When Porter arrived at the truck stop, Banks and Defendant were already there. Defendant then asked Porter to drive him to the victim's home in Rosepine. Once they arrived at the victim's home, the victim walked toward Porter's vehicle. Defendant then jumped out of the vehicle and started to fight the victim. Banks also exited the vehicle, but Porter stated that he could not see Banks fighting the victim. Porter became uncomfortable and turned the car around. He recalled Banks reentered the vehicle, followed by Defendant, and Porter drove away. Porter did not see the victim, but when they were driving away, he saw a bloody knife in Defendant's hand. He described the knife as a blade with brass knuckles on it. When he saw Defendant with the victim's identification, phone, and wallet, Porter told Defendant to get the victim's things out of his car.

Banks was interviewed by Det. Ortiz on April 14, 2011, at 7:58 p.m. The interview ended at 8:07 p.m. Banks told the detective that Porter picked him up from his home around 8:00 or 9:00 p.m. on April 13. They met Defendant at a truck stop. The three men then traveled in a vehicle to the victim's residence. While proceeding to the victim's home, Defendant told the men he was planning to beat up the victim. Banks stated that, when they arrived at the victim's home, Defendant exited the vehicle, while he and Porter stayed in the car. Banks estimated Defendant was out of the vehicle two or three minutes. When Defendant got back to the car, the three men left. Banks stated Defendant said he beat up the victim, but Defendant did not mention he stabbed the victim. After Banks returned home, Porter called at 1:00 a.m. and told him Defendant had killed the victim.

In a subsequent interview, Banks amended his statement, recalling that Defendant "started stabbing" the victim as soon as he got "in range" and that, when Perry "wasn't going down[,]" Porter came from the driver's side of his car and

5

started punching Perry. Porter then grabbed the victim's cell phone and money, while Defendant "got the weed[.]" Both Porter and Defendant then "hopped back in the car[,]" and they all "rolled off[.]"[2]

Detectives conducted another interview of Defendant on April 15, 2011, at 11:28 a.m., after Defendant had again requested to speak to them. Detectives Noel Yates and Hilton were present for the recorded and transcribed statement, which was introduced into evidence as well. Defendant stated he, along with Banks and Porter, planned to steal an ounce of hydro-marijuana from the victim and admitted he was carrying a pair of brass knuckles, which had a knife protruding from it. He recalled, as the victim approached the car, Banks hit the victim, and the three men exited the vehicle and jumped on top of the victim. Defendant admitted he punched the victim with his brass knuckles and unintentionally stabbed him with the knife. Additionally, he recalled he accidentally cut Banks during the fight, but he did not recall how he was cut on his own leg. Defendant admitted he was the only one with a knife. He further explained the only reason the group went to the victim's home was to steal the hydro-marijuana and to fight the victim; he did not intend to kill Perry, though. During the fight, the group took the victim's phone. After Defendant and his friends left the victim's home, they threw the phone out the car window as they were traveling. When Defendant returned to his home, he threw the knife in a trashcan next to his house.

Although the three men gave conflicting statements to the police, they all agreed Defendant was the one who stabbed Perry with the brass knuckle blade during the robbery. The autopsy revealed that, of the seven stabbing and slicing

---

[2] The defense introduced the transcript of this interview, conducted on April 21, 2011, into evidence as well.

6

wounds inflicted, only the stab wound to the victim's upper left chest was lethal, puncturing the lung and aorta, which resulted in massive hemorrhaging.

The police never recovered the murder weapon, although Perry's cell phone and driver's license were found in the median along Hwy 171. Officers obtained a search warrant for the Griffin residence, but the search did not produce any evidence directly linking Defendant to the crime, although the pants he wore that evening were recovered from the residence's washing machine.

On June 2, 2011, a grand jury indicted Defendant with (1) first degree murder, (2) criminal conspiracy to commit armed robbery, and (3) armed robbery. At his arraignment on July 5, 2011, Defendant entered a not guilty plea to each charge. The State charged both Banks and Porter with the same crimes.

Pursuant to plea agreements, both Banks and Porter, on September 5, 2012, pleaded guilty to manslaughter and conspiracy to commit simple robbery, with sentencing deferred pending their testimony and cooperation at Defendant's trial. As the factual basis for their pleas, the State contended:

> [I]f tried the State could prove that there was an agreement between [all three defendants] to travel to the Rosepine area . . ., where the victim, Jason Perry, lived for the purpose of committing a theft or robbery of Marijuana from Mr. Perry. These three individuals, in fact, in [Porter]'s vehicle that met at Paul's Truck Stop, they did, in fact, travel to the Rosepine area to Mr. Perry's residence. Immediately upon arrival at that residence, which was a trailer, apparently from the information developed by law enforcement and from statements from all three defendants, a fight ensued involving all parties, at least as far as - - certainly, as far as being a principal is concerned and as a result of that the victim, Mr. Perry, died as a result of that altercation. The parties then left and went back to Paul's Truck Stop and eventually wound up at their three respective residences that night.

On March 6, 2013, the State filed its motion not to seek the death penalty. Defendant subsequently filed a Motion to Suppress Statements of the Defendant, Evidence Found on His Person, and the Fruits of All Information Obtained as the Result of the Unlawful Arrest of the Defendant on August 6, 2013. The trial court

7

heard the motion on August 27, 2014, and, after reviewing post-hearing memoranda, denied the motion on October 8, 2014.

On that same date, the State and the defense met to discuss a possible plea, with trial set for October 20, 2014. During plea negotiations, the State and the defense agreed there might be a plea that could be taken to manslaughter, conditioned on the victim's family's approval, and the defense moved, without objection from the State, to continue the plea date and trial date. At that time, the State and defense agreed that the trial court could fix a court date for the taking of a possible plea. However, after speaking with the victim's family the next day, October 9, 2014, and again on October 14, 2014, the State contacted Defendant's attorney to inform him that, in two separate conversations with the family, they had rejected any plea agreement; therefore, the possible plea was not enforceable. Defendant than filed a Motion and Order to Enforce Plea Agreement, which was heard on October 22, 2014. After taking the matter under advisement, the trial court granted the motion, finding an agreement existed between the State and Defendant upon which Defendant relied to his detriment. This court granted the State's writ application and vacated the trial court's ruling, finding in a two-to-one ruling that the defense failed to prove there was a binding agreement between the State and Defendant. *State v. Griffin*, 14-1315 (La.App. 3 Cir. 2/11/15) (unpublished opinion). The supreme court denied Defendant's writ application. *State v. Griffin*, 15-540 (La. 4/17/15), 168 So.3d 405.

Prior to trial, the State amended the indictment to include La.R.S. 14:30(A)(1) and (A)(6) on count one in direct response to defense counsel's Motion for Bill of Particulars and Defendant's pro se Motion to Quash, both filed on August 10, 2015. It was further clarified that, with regard to (A)(1), the specific crimes at issue were only second degree robbery, simple robbery, and armed

8

robbery. Thereafter, the trial court denied the motion to quash. Although the court did not specifically state it was also denying the Bill of Particulars, it is clear that the court determined the amendment to the indictment sufficiently answered the Bill of Particulars. The trial court likewise denied Defendant's pro se Motion to Suppress, which was also filed on August 10, 2015.

Jury selection began and concluded on August 10, 2015, with trial commencing the next day. On August 15, 2015, the trial court charged the jury, which retired to deliberate at 11:40 a.m. A little over an hour later at 12:45 p.m., the jury returned with an eleven guilty and one not guilty verdict to the charge of first degree murder. For the remaining two charges—conspiracy to commit armed robbery and armed robbery—the jury returned unanimous verdicts of guilty.

On August 31, 2015, defense counsel filed a Motion in Arrest of Judgment and a Motion for Judgment of Acquittal, along with memoranda in support of both motions. The trial court denied the motion for acquittal by Order dated September 1, 2015. Defense counsel then filed a Motion for New Trial and a Supplemental Motion in Arrest of Judgment, all of which the trial court heard on September 23, 2015. After considering each motion, the trial court granted the motion in arrest of judgment, setting aside the guilty verdict for armed robbery, with the State's agreement, on the grounds of double jeopardy, as armed robbery was one of the underlying crimes used to prove felony murder. The remaining motions were denied.

On September 25, 2015, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for first degree murder and three and one-half years at hard labor for conspiracy to commit armed robbery, to be served consecutively. Defendant filed

a Motion for Appeal and Designation of Record on September 29, 2015, which was granted on October 9, 2015.

## ASSIGNMENTS OF ERROR

Defendant, through counsel, raises four assignments of error:

(1) The trial court erred in failing to suppress the statements of Appellant as well as any evidence derived as a result of these statements.

(2) Appellant requests this court re-examine this court's pre-trial ruling reversing the trial court's grant of Appellant's Motion to Enforce Plea Agreement.

(3) The trial court erred in allowing the opinion testimony of Detective Steven Ray Moss with regard to the nature of text messages.

(4) The prosecutor permitted the false testimony of two co-defendants, Andre Porter and Dontrez Banks, to be introduced at the trial of this case, in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), thereby depriving Appellant of a fair trial.

Defendant also raises five assignments of error pro se:

(1) The trial court's instructions to the jurors on the definition of first degree murder was a constructive amendment of the indictment;

(2) There was insufficient evidence to convict petitioner of murder during the distribution of illegal drugs;

(3) Appellant was denied his right to a complete defense when the trial court sustained the state's objection to appellant's trial counsel's cross examination of the state's witness[es] as to their admissions of guilt during guilty plea trials;

(4) Appellant has been denied his right to appeal where the court refuses to provide appellant with copies of voir dire transcripts;

(5) Appellant suffered ineffective assistance of trial counsel under two separate theorys [sic] . . . .:

> (a) trial counsel's failure to seek a mistrial or maintain an objection to the court proceeding to trial with a petiti [sic] jury tainted by predisposed comments of appellant's guilt was ineffective assistance of counsel; and

> (b) [c]ounsel's failure to object to the erroneous jury instruction was ineffective assistance of counsel[.]

10

On November 14, 2016, this court, after hearing oral arguments, ordered the record supplemented with the voir dire transcript. Additional briefing notices were issued following receipt of the supplemental record. While Defendant and the State submitted supplemental briefs to this court, Defendant's appellate counsel chose not to do so. In his supplemental brief to this court, Defendant further asserts his trial counsel rendered him ineffective assistance when he:

(1) failed to object to the entire voir dire proceedings; (2) failed to seek a mistrial after hearing a prospective juror taint the entire jury pool with prejudicial opinions of guilt; (3) failed to request individual questioning of prospective jurors during voir; and (4) failed to object to the systematic exclusion of all of the blacks from his jury.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, we have reviewed this appeal for errors patent on the face of the record. Having found none, we turn now to a discussion of each assignment of error, beginning with the four assignments raised by appellate counsel.

## DISCUSSION

**ASSIGNMENT OF ERROR NO. 1:**

> *The trial court erred in failing to suppress the statements of Appellant as well as any evidence derived as a result of these statements.*

In this first assignment of error, defense counsel argues the trial court erred in failing to suppress Defendant's statements as well as any evidence derived as a result of these statements. During the suppression hearing held prior to trial, the defense set forth the following grounds for suppression:

(1) Defendant was arrested in his home without an arrest warrant and without exigent circumstances or other exceptions to the warrant requirement;

(2) Defendant was subjected to unlawful interrogation while being unlawfully held; and

11

(3) Defendant was suffering symptoms and effects of severely low blood sugar at the time he was unlawfully held and interrogated.

As previously noted, the trial court denied Defendant's motion to suppress. In its written ruling, the trial court first addressed the constitutionality of the arrest, starting with a discussion concerning the time at which Defendant was arrested. While the State contended Defendant was merely detained until his formal arrest at 10:00 a.m. on the morning after the crime, the trial court agreed with the defense that, based on the totality of circumstances, Defendant was arrested when he was first detained by Deputy Horton and taken to the station because "a reasonable person in the Defendant's place would not have felt that he was free to stay home." The trial court based its ruling on the holdings in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382 (1991) and *Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843 (2003), in which the Supreme Court found that an arrest occurs when a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter given the totality of the circumstances. It further remarked upon the striking similarities between the circumstances in *Kaupp*, wherein a seventeen-year-old was awakened at 3 a.m. and escorted to the police station shoeless and in handcuffs, and the circumstances in this case where "Defendant was awakened at 1 a.m. and escorted to the police station in handcuffs." In neither circumstance, the trial court reasoned, would a reasonable person "know that the handcuffs were merely for the protection of the officers and that it cannot be seriously suggested that under the circumstances a reasonable person would feel free when questioning started [if] he wanted to go home and go back to bed."

The trial court then addressed the legality of the warrantless arrest, finding there were no exigent circumstances that might justify the arrest because the police "had no reason to believe that the Defendant was a flight risk or might destroy

evidence[,]" citing *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371 (1980).

Looking next for probable cause, which, when present, serves as an exemption to

the exclusionary rule that would "bar the State's use of a statement made by the

defendant outside of his home, even though the statement is taken after an arrest

made in the home in violation of *Payton*[,]" the trial court reasoned:

> Probable cause exists if, at the time of the arrest, the officer has within his knowledge trustworthy facts and circumstances sufficient to warrant a reasonably prudent person to believe that the suspect has committed a crime. *Beck v. Ohio*, 379 U.S. 89 (1964). Probable cause is based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983).

> Officers knew that a murder had been committed and had the body. Officers also knew that Rosepine police had responded to an incident the night before involving broken windows in the victim's home where the Defendant was the main person of interest. Officers knew the victim had been living with and dating the Defendant's ex-girlfriend who was the mother of the Defendant's children. The victim's brother told officers about the "beef" between the victim and the Defendant, and that the Defendant had threatened the victim before.

> As stated in the affidavit for a search warrant, the Defendant's former girlfriend told police that the Defendant repeatedly made threats towards her and the men she dated. She also showed police text messages on her phone from the Defendant. The text messages read: "imma bitch but who ran well see tonight at his house"; "leave my lonely like you did last time want to run huh its war"; "I aint never been fake imma bring it back again lol watch how the ambassador get down when u f[***] your own kids money over bitch you can get knocked off too"; and "wanna test me i know where u be dude." The message "i know where u be dude," combined with information from the girlfriend, makes it clear that at least some of the threatening messages were directed at the victim. The message "bitch you can get knocked off *too*" (emphasis added) indicates that the Defendant's threats were directed beyond just his ex-girlfriend and could include murder.

> Given the totality of the circumstances a reasonably prudent person could believe that the Defendant had committed the crime. There was probable cause for the Defendant's arrest.

Accordingly, the trial court found "the exclusionary rule does not apply because

police did have probable cause for the arrest."

Regarding defense counsel's second grounds for exclusion, based on the involuntariness of the confession given Defendant's low blood sugar and corresponding inability to comprehend the consequences of his confession, the trial court found (alteration in original):[3]

> Voluntariness is assessed by looking at the totality of the circumstances, including the suspect's age, education, and mental and physical condition, along with setting, duration, and manner of interrogation. *Spano v. New York*, 360 U.S. 315 (1959).
>
> Just because a defendant is suffering from a medical condition does not mean that he cannot give a voluntary statement. *State v. Hahn*, 526 So. 2d 260 (La. App. 2 Cir. 1988), *writ denied*, 532 So. 2d 150 (La. 1988).
>
> > [W]hen a defendant contends that his mental capacity was impaired because of his physical condition at the time of his interrogation, the jurisprudence has consistently held that the confession will be admissible unless the defendant establishes that he was impaired to such a degree as to negate his comprehension and to render him unconscious of the consequences of what he was saying.
>
> *State v. Guidry*, 94-678, p. 5 (La. App. 3 Cir. 12/7/94), 647 So. 2d 502, 506 (citing *State v. Narcisse*, 426 So. 2d 118 (La. 1983), *cert. denied*, 464 U.S. 865 (1983)).
>
> In this case, the State offered the testimony of three police officers and documents which defendant signed to support the voluntariness of the statement. All of the police officers testified that defendant gave his statement freely and voluntarily, without force, coercion, or inducements of any kind.
>
> The Defendant's blood sugar was tested and found to be 37 around the time of his arrest. He was given candy and some kind of drink and his symptoms alleviated. Because he was not tested again, it is uncertain what his blood sugar level was throughout interrogation. However, the defense's own medical expert testified that, based on the officers' testimonies and other evidence, the Defendant's blood sugar was at least "high enough to give him normal brain function" and would have been "steadily rising" throughout the interrogation. Based

---

[3] Interestingly, the trial judge informed the defense and the State that he had Type 2 diabetes, which he controlled with insulin, and on the record, the defense acknowledged that Defendant had "no problem with going forward with the hearing even with the knowledge that you have Type 2 diabetes."

on the evidence, the Defendant was capable of comprehension and was conscious of the consequences of what he was saying.

It is hereby ordered that the Defendant's *Motion to Suppress* is DENIED.

On appeal, we review the entire record to determine the correctness of a trial court's ruling on a motion to suppress, affording great weight to a trial court's denial, which will not be set aside "unless a preponderance of the evidence clearly favors suppression." *State v. Snelling*, 09-1313, p. 2 (La.App. 3 Cir. 5/5/10), 36 So.3d 1060, 1064, *writ denied*, 10-1301 (La. 12/17/10), 51 So.3d 16. As this court has further explained:

> "In determining the legal correctness of the trial court's ruling on a defendant's motion to suppress, a reviewing court is not limited to evidence adduced at the hearing on that motion; it may also consider all pertinent evidence given at the trial of the case." *State v. Guidry*, 94-678, p. 6 (La.App. 3 Cir. 12/7/94); 647 So.2d 502, 507.

> . . . .

> A determination of the weight of evidence presented is a question of fact. The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witness and is a matter of weight of the evidence and not sufficiency. *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *State v. Nolan*, 503 So.2d 1186 (La.App. 3 Cir.), *writ denied*, 507 So.2d 226 (La.1987).

> A fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See *State v. Mussall*, 523 So.2d 1305 (La.1988). Determination of credibility will not be disturbed on appeal in the absence of manifest error. *State v. Sanders*, 542 So.2d 1134 (La.App. 3 Cir.1989).

*State v. Green*, 96-208, pp. 3, 8 (La.App. 3 Cir. 11/6/96), 683 So.2d 1292, 1294, 1297, *writ denied*, 96-2892 (La. 6/13/97), 695 So.2d 963.

15

In brief to this court, defense counsel contends Defendant was arrested in his home without an arrest warrant and without exigent circumstances or other exceptions to the warrant requirement. Counsel further argues the State failed to prove an exception to "legitimize this warrantless arrest[,]" contending none of the State's witnesses articulated exigent circumstances to justify entering Defendant's parents' home.

While conceding there was an arrest, the State in opposition contends that, though the trial court did not err in finding probable cause, it did err in finding no exigent circumstances. The State further asserts Defendant's father gave his consent for the officers to enter his home.

The law applicable to warrantless arrests in a private home has long provided:

> The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Similarly, the Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. 1, § 5. Warrantless entries into the home for arrest or seizure are invalid in the absence of exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment has drawn a firm line at the entrance to the home, and a police officer therefore needs both probable cause to arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into a private premises. *State v. Talbert*, 449 So.2d 446 (La.1984); *State v. Hathaway*, 411 So.2d 1074 (La.1982). Probable cause to arrest without a warrant exists when the facts and circumstances known to the arresting officer are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); La.C.Cr.P. art. 213; *State v. Raheem*, 464 So.2d 293 (La.1985).

*State v. Brisban*, 00-3437, pp. 4-5 (La. 2/26/02), 809 So.2d 923, 927 (alterations in original). Though generally both federal and state constitutional guarantees prohibit police from making warrantless entries into private homes, an exception to

the warrant requirement is recognized "where voluntary consent has been obtained, either from the property owner or from a third party who possesses common authority over the premises." *State v. Simmons*, 08-269, p. 12 (La.App. 5 Cir. 10/28/08), 996 So.2d 1177, 1184, *writ denied*, 09-15 (La. 9/25/09), 18 So.3d 81 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990)). "Consent may be given by one having 'common authority' over the premises sought to be searched. Common authority is based on 'mutual use of the property by persons generally having joint access or control for most purposes.'" *State v. Edwards*, 97-1797, p. 11 (La. 7/2/99), 750 So.2d 893, 901, *cert. denied*, 528 U.S. 1026, 120 S.Ct. 542 (1999) (quoting *U.S. v. Matlock*, 415 U.S. 164, 94 S.Ct. 988 (1974)).

Our review of the entire record clearly reveals Defendant's father consented to the warrantless entry into his home. At the hearing on the motion to suppress, Deputy Horton testified that Carl Griffin opened the door of the residence, explaining:

> Q. And what, if anything, was the conversation you had between yourself and Carl Griffin?
>
> A. I advised Mr. Griffin of myself and Deputy Adams were with the Vernon Parish Sheriff's Office and that we was [sic] trying to locate Joshua Griffin.
>
> Q. And did you ask if he knew where - - whereabouts of Joshua Griffin were?
>
> A. Yes, sir, he stated he was in his bedroom inside of the residence.
>
> Q. Did you ask permission to enter the residence of 1107 Maple Grove Circle from Mr. Carl Griffin?
>
> A. Yes.
>
> Q. And what, if anything, did he say?
>
> A. He said that we could.
>
> Q. And what, if anything, did you do next?

A. Mr. Griffin then escorted myself and Deputy Adams to a bedroom that had a closed door, he then opened the bedroom door and we walked in.

Q. And did you find Joshua Griffin in that bedroom?

A. Yes, sir, he was laying [sic] in bed.

Deputy Adams, who accompanied Deputy Horton to the Griffin residence and assisted in Defendant's arrest, also testified they "were invited into the residence." Therefore, the next question we must resolve is whether the officers had probable cause to arrest Defendant.

As our supreme court has expounded, "[p]robable cause to arrest exists when the facts and circumstances within an officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the accused has committed an offense." *State v. Scales*, 93-2003, p. 6 (La. 5/22/95), 655 So.2d 1326, 1331, *cert. denied*, 516 U.S. 1050, 116 S.Ct. 716 (1996) (citing *State v. Elliot*, 407 So.2d 659 (La.1981); *State v. Wilson*, 467 So.2d 503 (La.), *cert. denied*, 474 U.S. 911, 106 S.Ct. 281 (1985)). The court has further cautioned that probable cause is not absolute cause, and a court, in determining its existence, "must examine facts and circumstances within the arresting officer's knowledge in light of the experience of reasonable people, not legal technicians." *Id.* (citing *State v. Billiot*, 370 So.2d 539 (La.), *cert. denied*, 444 U.S. 935, 100 S.Ct. 284 (1979)). This determination, however, "[']does not rest on the officer's subjective beliefs or attitudes but turns on a completely objective evaluation of *all* of [the] circumstances known to the officer at the time of his challenged action.[']" *State v. Slaydon*, 05-794, p. 6 (La.App. 3 Cir. 2/1/06), 921 So.2d 1199, 1204 (alteration in original) (quoting *State v. Anthony*, 98-406 (La. 4/11/00), 776 So.2d 376).

In *State v. Freeman*, 503 So.2d 753 (La.App. 3 Cir. 1987), which the State cited, the defendant challenged the denial of his motion to suppress evidence, on appeal, for lack of probable cause to arrest. This court found probable cause for the arrest explaining, in pertinent part:

> At the time of the defendant's arrest, the arresting officer knew the following facts: The victim had been shot in the head with a shotgun; the culprit probably stole the victim's car; the perpetrator was probably wearing shoes with serrated soles; the shoeprints of the serrated soled shoes lead from the Fontenot residence to the victim's house; soon after the estimated time of death, a black male wearing a tan cap was seen speeding in the victim's car; defendant is black; defendant had just admitted to owning shoes with what appeared to be identical sole serrations as those seen at the murder scene; similar serrated-sole shoeprints were seen around the Fontenot residence; a tan cap fitting the earlier description had just been located in the house where defendant resided; the officer knew the defendant had previously lied when initially asked about the ownership of the shoes. It appears that with the knowledge of all of the above facts, the arresting officer had probable cause to conclude that defendant had committed this crime. As stated earlier, probable cause to arrest need not be established by evidence sufficient to convict.

*Id*. at 759. Similarly, in *State v. Simms*, 571 So.2d 145, 149 (La.1990), which the State also cited, the supreme court found probable cause when the defendant, on appeal, likewise challenged the denial of his motion to suppress:

> The totality of the information known to the police at the time of the arrest in this case was sufficient to justify a man of ordinary caution in believing defendant had committed a crime upon Mary Robertson. The police knew the following facts: the victim was missing; the victim and her sister regularly received telephone calls at defendant's residence; the victim was told by a visitor around midnight that there was a telephone call for her sister; the victim left her home, apparently expecting to return immediately because she wore no shoes and left the door ajar and the kitchen light burning; defendant was the only person at the Simms' residence during the evening; a bloodstained sheet and an earring of the type always worn by the victim were found in defendant's residence; defendant's clothes were washing in the machine about 2:00 a.m.; and defendant had a fresh scratch on his back that he could not explain. Additionally, the police were aware of defendant's mother's belief that something suspicious had occurred at her home in her absence and of the victim's father's belief that his daughter would not have left the neighborhood voluntarily under these circumstances.

In light of this jurisprudential guidance, we must now review all of the relevant testimony and evidence from the hearing on the motion to suppress and from the trial to determine if the State established probable cause for the warrantless arrest.

During trial, Chief Parrott testified the Rosepine Police Department received a call, on the night of the offense, of a body lying in the driveway at 17744 Lake Charles Highway in Vernon Parish. Upon arriving at the scene at 10:52 p.m., he secured the area and called the VPSO. When the VPSO officers arrived, Chief Parrott discussed with Det. Martin how the victim had called him and told him he was receiving threatening text messages from Defendant. Chief Parrott further informed Det. Martin that he had advised the victim to bring him the text messages, but the victim was killed before he could do so.

At the suppression hearing and at trial, Det. Ortiz testified he received a phone call on the night of the offense from Det. Martin, who informed Det. Ortiz of a body found lying in a driveway near a residence located at 17744 Lake Charles Highway in Vernon Parish. Det. Ortiz then proceeded to the scene and spoke with Chief Parrott who informed him that, on the night before the victim was stabbed, the victim made a report of someone busting the window of his home. Chief Parrott also informed Det. Ortiz that Defendant was a person of interest.

On the night of the murder, Det. Ortiz also spoke with the victim's girlfriend, Estrada. During her interview at the scene, Estrada showed the detective her cell phone, which contained threatening text messages from Defendant. The detective read the messages into the record. Some of these messages are in the trial court's written reasons denying the motion to suppress, which are set forth above.

Det. Ortiz further testified that, when the victim's brother, Perdue, arrived at the scene, he informed the detective that Defendant and the victim had a conflict and that Defendant had threatened the victim.

After receiving the information from Estrada and Perdue, Det. Ortiz conveyed this information to Det. Hilton, who decided to locate Defendant. According to Det. Ortiz, Deputy Horton and Louisiana State Trooper Brandon Edwards were sent to locate Defendant. After Defendant was located at his parents' residence, Det. Ortiz traveled to that location, arriving around 1:59 or 2:00 a.m. By that time, Deputy Horton had already placed Defendant in his police car.

On cross-examination, Det. Ortiz acknowledged that the text messages on Estrada's phone were directed to her and that there was no mention of the victim's name. The detective explained he took the text messages as a threat to the victim because of the reference to the word "dude."

At trial, Estrada testified that, on the day of the offense, she worked from 3:00 p.m. to 10:00 p.m. While she was at work, the victim visited her. After work, she went to the victim's residence. When she arrived, the police were there already. Estrada further testified the victim and Defendant regularly communicated with each other through text messages. She admitted Defendant texted her, and the following pertinent exchange occurred between the State and Estrada:

> BY MR. CABRA:
> Q. Let me ask you this question, between January of 2011 when you started seeing Mr. Perry and the night of April the 13th of 2011 w[hen] Mr. Perry died, did you, yourself, ever receive any text messages from Joshua Griffin?
>
> A. Yes, yes.
>
> Q. Did any of those text messages have anything to do with your relationship with Mr. Perry?
>
> A. Yes.

Q. Were any of those text messages in any way threatening?

A. Yes.

Also at trial, Phillip Jackson, a VPSO officer, testified he arrived at the scene the night of the offense, where he obtained a written, voluntary statement from Estrada. During the interview, Estrada informed him that she received text messages from Defendant. He then called Det. Ortiz over to discuss the messages with Estrada.

At the motion to suppress hearing, Det. Hilton testified he arrived on the scene at 12:08 a.m. on April 14, 2011. There, he learned from Det. Ortiz what Chief Parrott had told the detective regarding problems the victim had with Defendant the night before. Additionally, Det. Hilton was also informed of the text messages Estrada received from Defendant that contained "threatening messages towards" the victim. After receiving this information, Det. Hilton told Deputy Horton to locate Defendant.

In brief to this court, defense counsel argues that, at the time of Defendant's detention and arrest, the officers had only vague information from untested sources. According to the defense, the information regarding Defendant's potential involvement in the incident that occurred the previous evening, as well as the "threatening" text messages shown to Det. Ortiz at the scene, all came from Estrada and her cell phone:

> Chief Parrott informed Detective Ortiz that the prior night Jason Perry had reported that someone broke the windows out of his trailer. Joshua Griffin was a person of interest, based on information provided by Briana Estrada, who had been in a longtime relationship with Griffin until 2009 and was the mother of his two children. She started dating Perry just a few months before his death on April 13, 2011. Estrada, who had arrived at the trailer sometime before midnight on April 13, 2011, told Ortiz she had received several text messages from Griffin that she believed were threatening. Although Ortiz testified at the suppression hearing that the text messages were directed toward Perry, on cross-examination he acknowledged that he was not sure of

the time frame the texts had been sent, and that Perry was not mentioned by name. When asked if the threats were actually directed at Estrada, Ortiz stated because one of the texts had "dude" he assumed it was directed at Perry.

Not only was Estrada's credibility not tested, the messages she showed Ortiz did not mention Jason Perry by name and were mainly directed at her. Further, these messages were not substantiated as coming from Griffin; all Ortiz knew at the time was that Estrada said they were from Griffin. Additionally, most of the text messages were incomprehensible and Ortiz had not been provided a time line as to when the messages had been sent. (Citations omitted).

Defense counsel contends "Estrada's motives and trustworthiness should have been examined before the information was relied on to effect an arrest." Moreover, the defense asserts the only other information provided to Det. Ortiz prior to Defendant's arrest regarding a "beef" and prior altercation between the two men came from Perry's brother, Perdue. However, no information was provided to substantiate the information or the time frame in which it was alleged to have occurred. The defense further notes no physical evidence connected Defendant to either the earlier window-busting incident or the murder. Although the information relayed to Det. Ortiz by others was sufficient to consider Defendant a person of interest who needed to be questioned, it, in the defense's view, fell short of probable cause needed to enter someone's home, detain him against his will, and effect an arrest.

Defense counsel notes the only additional information mentioned at trial came from Chief Parrott's testimony about the call he received from Perry concerning text messages from Defendant. However, the defense further points out that Chief Parrott did not specify at what point he relayed this information to Det. Martin. And, although copies of text messages found in Perry's car were introduced into evidence, it was conceded that these messages were not located until sometime after Defendant had been taken into custody. Moreover, the

defense asserts the existence of probable cause "at the time of the arrest must be determined without regard to the result of the subsequent search." *State v. Buckley*, 426 So.2d 103, 107 (La.1983) (citing *State v. Finklea*, 313 So.2d 224 (La.1975)). Counsel concludes:

> Officers cannot pull themselves up by the bootstraps to legitimize a previously illegitimate arrest with inculpatory information subsequently and improperly derived as a result of the illegitimate arrest. It was not until the next day, April 15, 2011, that the detectives obtained arrest warrants for Griffin. By this time, the deputies had interviewed Griffin on several occasions, had investigated leads he had provided during the interviews and had also questioned Andre Porter and Dontrez Banks.

In response, the State contends the trial court correctly found probable cause for the arrest and relies heavily on *Simms*, which, it argues, is factually similar to this case:

> In this case, the Vernon Parish Sheriff's Officers knew there was a homicide and had the murdered body of Jason Perry. The officers also knew from the Chief of Rosepine Police, Dennis Parrott, that he was familiar with the victim, that he had responded the prior night to this residence to investigate someone busting the victim's windows out of his home and that the defendant was **the** person of interest in that crime. Further, the officers knew that the victim was living with and dating Briana Estrada who had been previously in a relationship with the defendant and Ms. Estrada and the defendant had children together. Also, officers knew of and had read the defendant's text messages he had sent to Briana Estrada's phone threatening the victim. The officers also had spoken to the victim's brother and he believed the defendant was responsible for his brother's death. Further, they knew the victim's brother was aware there was a "beef" between the victim and the defendant. Also, the officers knew the victim had shared with his brother that the defendant had threatened him.
>
> It is not a prerequisite for the existence of probable cause that the police know at the time of the arrest that a particular crime has definitely been committed. <u>Simms</u>, *supra*. However, in another homicide case with very similar facts, the Third Circuit Court of Appeals [sic] stated, "one of the most important factors in determining if probable cause existed is satisfied when police officers know a crime has actually been committed." <u>State v. Freeman</u>, CR 86-708 (La. App. 3 Cir. 3/4/87), 503 So.2d 753.

In the <u>Simms</u> case, the police didn't even have a body or substantial proof that a crime had been committed at the time of arrest. In this case, the officers absolutely knew they had a homicide and every bit of the information they had strongly pointed to the defendant. The State believes the evidence reveals that probable cause existed to detain/arrest this defendant. Therefore, his detention/arrest was not illegal as it was based on probable cause. (Citations omitted).

After reviewing all the evidence and arguments presented, we agree with both the State and the trial court that the officers had probable cause, based on the totality of the circumstances, to arrest Defendant in his parents' home. Before the arrest, the officers knew a crime had been committed. The officers knew Defendant was a person of interest in the incident involving the victim's windows that occurred the night before and that the victim had reported to Chief Parrott that Defendant had sent him threatening text messages. On the night of the murder, before Defendant was arrested, the victim's brother informed the police of the altercations between Defendant and the victim as well as Defendant's threats made toward the victim. Further, the victim's girlfriend informed the police that Defendant sent threatening text messages to the victim and showed them her cell phone messages at the scene. Based upon the reasonable and trustworthy information recited above, we find the trial court was correct in ruling that the State established the police had probable cause to arrest Defendant. Accordingly, we find no error by the trial court in its denial of the motion to suppress on constitutional grounds.

Defense counsel further argues Defendant's statements were not knowingly, freely, or voluntarily given due to his severely low blood sugar. Consequently, counsel asserts the statements were a result of police duress, coercion, physical and mental torture, and harassment. The defense explains that, when Defendant was arrested, he had a low blood sugar level of 37. Despite this, none of the detectives questioned if Defendant was still suffering from low blood sugar at the time of the

interviews conducted later that morning—at 5:28 a.m. and 9:09 a.m.—and whether this could impair his cognitive ability. In summarizing the testimony of Dr. Brian Tulloch, the expert in diabetes and endocrinology called by the defense during the suppression hearing, counsel explains:

> Dr. Tulloch testified that [a] normal reading[] for a Type 1 diabetic[, like Defendant,] was between 80 to 120. A low reading is 50 and very low is 25. If a person's normal is around 80, at around 50, they will become sweaty and restless. For every 10 points below 50, it would be like taking a slug of alcohol. At 40, the brain functions are affected and the person appears to be tipsy. By 30, the person would be equivalent to a drunk person. By 20, the person would likely seize. If a person had been a diabetic for years, the symptoms become less sensitive. (Citations omitted).

As recounted in counsel's brief, Dr. Tulloch further testified that once Defendant ate the candy (one-third of a bag of Skittles) given to him at the Griffin residence, his blood sugar

> would rise within fifteen minutes and would maximize at about two hours and then start to fall again. The rate at which it falls would depend on the amount and type of insulin he had taken the night before. Dr. Tulloch testified that, with information that Griffin was using NPH (a form of insulin), his blood sugar would continue to rise. (Citations omitted).

However, counsel notes that (1) no one could say whether Defendant had eaten anything other than the Skittles over the course of the next ten or so hours, and (2) no one testified that he was given any insulin during this time.

Although the State questioned the doctor in detail about the blood sugar levels rising, the defense alleges these questions and the doctor's response were based on the assumption that Defendant had taken his medicine timely and correctly and had eaten. Moreover, the defense conceded:

> The doctor agreed with the prosecutor that no one testified that Griffin complained about headaches, faintness, dizziness, pounding heart, blurred vision, irritability or change of personality, although officers testified that he was sitting with his eyes closed. Dr. Tulloch acknowledged that, based on the testimony of the three to four officers who testified at the hearing, it would appear his blood sugar was high

enough to give normal brain activity. Again, this assumption was based on the officers' testimony about the appearance of Griffin during the early morning hours. However, none of these officers were familiar with his normal behavior and would not have been able to tell if he was acting differently. (Citations omitted).

The State, however, argues there was no evidence Defendant was suffering from a "diabetic situation" which prevented him from giving a free and voluntary statement.

Our review of the evidence supports the trial court's finding that "Defendant was capable of comprehension and was conscious of the consequences of what he was saying." In its written reasons, the trial court recited how Defendant's own expert opined that, based on the testimony of the officers and other evidence, Defendant's blood sugar was at least high enough for normal brain function and would have steadily risen throughout the interrogation: "Sir, I listened carefully to the three or four officers who came by. From what I understand of their testimony it was high enough to give him normal brain function, so that would be 55 or above or even 80 and above, if you like."

Moreover, the expert's testimony at the suppression hearing and also Defendant, in his brief to this court, both point out that a sign of low blood sugar in a diabetic person is that they behave like they are drunk or on drugs. Additionally, the expert testified the diabetic person experiencing low blood sugar starts talking nonsense. However, there was no evidence in the record Defendant exhibited any of these symptoms.

After reviewing the record, we find the defense presented no evidence at the suppression hearing or at trial to prove Defendant's statements were not freely and voluntarily given on the basis he suffered from symptoms related to low blood sugar. Accordingly, we find no error in the trial court's denial of Defendant's

motion to suppress on the grounds of involuntariness. This assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 2:**

> *Appellant requests this court re-examine this court's pre-trial ruling reversing the trial court's grant of Appellant's Motion to Enforce Plea Agreement.*

In this second assignment of error, defense counsel argues the trial court was correct in granting Defendant's pretrial "Motion to Enforce Plea Agreement." As noted in the facts recited previously, the State and Defendant tentatively reached a plea agreement whereby Defendant agreed to plead guilty to manslaughter and conspiracy to commit simple robbery contingent upon the victim's family's approval. After the family rejected the agreement just days later, the State rescinded its agreement. Prior to trial, the trial court granted Defendant's "Motion to Enforce Plea Agreement." The State sought this court's review, and we reversed the trial court's ruling:

> **<u>WRIT GRANTED AND MADE PEREMPTORY</u>**: The Defendant failed to prove there was a binding agreement between Defendant and the State. Therefore, the trial court erred when it granted Defendant's motion to enforce the plea agreement. Accordingly, the trial court's ruling is vacated, and the matter is remanded to the trial court for further proceedings.
>
> Conery, J. dissents and would deny the writ finding the trial judge's decision to enforce the plea agreement was within his discretion and was based on his greater familiarity with the parties and his findings of fact.

*State v. Griffin*, 14-1315 (La.App. 3 Cir. 2/11/15) (unpublished opinion), *writ denied*, 15-540 (La. 4/17/15), 168 So.3d 405. Defense counsel now urges the trial court was correct.

Significantly, however, the deference afforded to pre-trial decisions rendered by this court is great and should not be disturbed unless it is apparent that the decision was patently erroneous or the results produced thereby were unjust:

This court has held that great deference should be afforded to pre-trial decisions:

> Although a defendant may seek review of a pretrial ruling even after a pretrial supervisory writ application is denied, when the defendant does not present any additional evidence on the issue after this pretrial ruling, the issue can be rejected. *State v. Hebert*, 97-1742 (La.App. 3 Cir. 6/3/98), 716 So.2d 63, *writ denied*, 98-1813 (La.11/13/98), 730 So.2d 455, *cert. denied*, 529 U.S. 1072, 120 S.Ct. 1685, 146 L.Ed.2d 492 (2000) (quoting *State v. Magee*, 93-643, p. 2 (La.App. 3 Cir. 10/5/94), 643 So.2d 497, 499). However, "[j]udicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results." *Hebert*, 716 So.2d at 68. Our review of the record reveals no additional evidence for the defendant's allegations of prosecutorial misconduct which would support his pretrial motions.

> *State v. Perry*, 12-298, p. 7 (La.App. 3 Cir. 11/7/12), 101 So.3d 575, 580, *writ denied*, 12-2657 (La.5/24/13), 116 So.3d 659 (alteration in original).

*State v. Davis*, 13-275, p. 48 (La.App. 3 Cir. 10/23/13), 129 So.3d 554, 584, *writ denied*, 14-10 (La. 6/13/14), 140 So.3d 1186, *cert. denied*, ___ U.S. ___, 135 S.Ct. 678 (2014).

In this case, because defense counsel fails to (1) set forth any additional evidence or (2) prove this court's pretrial ruling was patently erroneous or produced an unjust result, we find this assignment of error is likewise meritless.

**ASSIGNMENT OF ERROR NO. 3:**

> ***The trial court erred in allowing the opinion testimony of Detective Steven Ray Moss with regard to the nature of text messages.***

Defense counsel in this assignment argues the trial court erred in allowing the opinion testimony of Det. Moss, who was the VPSO evidence custodian, on the nature of the copies of the text messages found under the armrest of the victim's vehicle at the scene. In its case-in-chief, the State questioned Det. Moss about whether he read the messages and whether he had an interpretation of them. At

this point, the defense objected, arguing the documents spoke for themselves. Thereafter, a bench conference was held, wherein the defense again argued the documents were self-explanatory and, therefore, needed no interpretation. The trial court overruled the objection, and the State continued its line of questioning, inquiring why the detective took the messages into evidence. Det. Moss testified that, in his opinion, they were evidence. Again over the defense's objection, the trial court allowed the State to ask the detective about the significance or meaning of the messages:

> Q. Detective Moss, at the time that you discovered these messages . . . did you know that they had any significance in this case?
>
> A. Only from looking at them and reading them and from the nature of what I read, I knew that it was evidence and probably important in the case and that's why I took them into evidence.
>
> Q. After you did so, why did you believe that?
>
> A. From looking at the text messages they appeared to be of a threatening nature and that's why I took them into evidence.

The State then requested to publish the text messages to the jury. Another bench conference was held, and the defense again objected to the State asking Det. Moss to draw a conclusion. At that time, the defense requested the opportunity to cross-examine the witness prior to the exhibits being published. The trial court overruled the objection and allowed the exhibits to be published to the jury at that time. On cross-examination, the defense asked Det. Moss if the text messages were mutually threatening. The detective responded they were of a threatening manner, but he could not recall how Perry replied to Defendant's threats.

Defense counsel now argues that because (1) Det. Moss was not offered as an expert, (2) his opinion was not offered to assist the jury in evaluating the evidence, and (3) the State did not establish his opinion was based on his

30

experience as an officer, his opinion was that of a lay witness and, thus, was improperly admitted.

In response, the State contends Det. Moss was not testifying in order to tell the jury what the text messages meant. Rather, the State, citing La.Code Evid. art. 701, argues that, as a trained detective, Det. Moss could testify as to his opinion and inferences when rationally based on his perception, even if not qualified as an expert witness. Furthermore, the State argues admission of the testimony, if error, was harmless. The State points out Det. Moss testified on cross-examination that both the victim and Defendant were mad at each other and "trash talking" each other. Moreover, the State contends sufficient evidence, excluding the detective's opinion, was introduced to prove beyond a reasonable doubt Defendant was guilty.

Our law limits the testimony of a lay witness given in the form of opinions or inferences to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La.Code Evid. art. 701; *State v. Keller*, 09-403 (La.App. 5 Cir. 12/29/09), 30 So.3d 919, *writ denied*, 10-267 (La. 9/17/10), 45 So.3d 1041. While we consistently permit a law officer to testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert, only experts are allowed to give opinion testimony in areas of specialized knowledge. *See State v. LeBlanc*, 05-885 (La.App. 1 Cir. 2/10/06), 928 So.2d 599. To determine whether the trial court properly allowed lay opinion testimony, a reviewing court must ask two questions: "(1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error." *Id.* at 603.

31

"Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact." La. C.E. art. 704; *State v. Higgins*, 03-1980 (La.4/1/05); 898 So.2d 1219, 1234, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). In other words, the fact an opinion or inference embraces an ultimate issue in a case does not preclude its admissibility. La. C.E. art. 704, Comment (c); *State v. King*, 99-1279 (La.App. 5 Cir. 4/25/00); 760 So.2d 540, 543, *writs denied*, 00-1452 and 00-1498 (La.3/16/01); 787 So.2d 298. The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. *State v. Friday*, 10-2309 (La.App. 1 Cir. 6/17/11); 73 So.3d 913, 922, *writ denied*, 11-1456 (La.4/20/12); 85 So.3d 1258.

*State v. Griffin*, 14-251, pp. 21-22 (La.App. 5 Cir. 3/11/15), 169 So.3d 473, 487.

Relevant herein, the defendant in *Griffin* challenged a detective's testimony regarding the meaning of slang language used in a phone conversation, arguing the detective was not an expert and so his opinion should have been excluded. The *Griffin* court disagreed, holding:

Upon review, we find the trial court did not err in allowing Det. Vasquez to testify as a lay witness under La. C.E. art. 701 as to inferences regarding the contents of the recorded phone conversations based on his own observations and experiences. In *State v. Decay*, 01-192 (La.App. 5 Cir. 9/13/01); 798 So.2d 1057, 1072-74, *writ denied*, 01-2724 (La.8/30/02); 823 So.2d 939, this Court found a trooper's testimony interpreting "slang" in a telephone conversation to be permissible lay testimony under La. C.E. art. 701, despite the defendant's argument that expert testimony was required and that the trooper had not been qualified as an expert. The trooper in *Decay* interpreted the defendant's statement, "I be trying to get me about two, bra," to mean that the defendant wished to buy two kilograms of cocaine. This Court determined that the trooper's testimony was to inferences made based on his observations and his experience of being a State trooper for seven years.

. . . .

Furthermore, we are persuaded by *King v. United States*, 74 A.3d 678 (D.C.2013), cited by the State, which interprets the Federal Rules of Evidence upon which La. C.E. art. 701 is based. In *King*, the defendant argued the trial court erred in allowing a police officer and a detective to testify as lay witnesses as to the meaning of certain "street lingo" used in recorded jailhouse phone calls. The defendant maintained the officers were testifying about a specialized subject beyond the understanding of the average lay person. The officers

explained that they based their "street lingo" interpretations on their lengthy experience working on criminal investigations in the area and regularly speaking about crime with young people in that community. The appellate court found the trial court properly admitted the officers' testimony as lay witness testimony because "the witnesses based their opinions on their personal experiences and observations and used reasoning processes familiar to the average person in everyday life to reach their proffered opinion."

The appellate court explained that lay testimony is that which "results from a process of reasoning familiar in everyday life," whereas "an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *King*, 74 A.3d at 682 (internal citations omitted). The court concluded that the "reasoning process employed to interpret the street language was the everyday process of language acquisition" and that the officers "did not use any special training or scientific or other specialized professional knowledge to form their opinions about the meaning of the language used by the individuals in this case." *Id*. at 683.

In this case, Det. Vasquez testified as to his opinion of the meaning of certain "slang" words in the recorded phone calls based on his personal experiences and observations. Specifically, Det. Vasquez stated that his knowledge was gained from his nine years of experience as a police officer and the "countless" cases he has investigated in the community. He explained that he has come to understand the meaning of various slang terms through his contact with and interviewing of various individuals during his employment as a police officer. He further explained that he was able to identify the various individuals in the phone calls from listening to "hundreds of hours" of phone calls involving the defendants and his investigation into the case.

Thus, we conclude that Det. Vasquez's opinion was properly admitted as lay testimony that resulted from his observations and experiences as a police officer. We find his opinions resulted from the "process of reasoning familiar in everyday life," as opposed to "a process of reasoning which can be mastered only by specialists in the field." Further, Det. Vasquez's testimony provided the jury with relevant factual information about the investigation, including the meanings of terms used in the conversations and the identification of the individuals referenced during the phone calls.

*Id.* at 487-89 (footnotes omitted).

Defense counsel herein argues *Griffin* is distinguishable because (1) the State failed to ask Det. Moss the context and foundation for his opinion and (2) the detective did not provide information that was useful to the jury in evaluating the

messages or defining the messages. To the contrary, we find this case is strikingly similar to *Griffin*. Like the officer in *Griffin*, Det. Moss applied a process of reasoning familiar in everyday life to interpret the text messages, and he did not use any special training or scientific or other specialized professional knowledge to form his opinion. For the reasons espoused herein, we find the trial court did not err in allowing its admission. Therefore, this assignment of error is also without merit.

**ASSIGNMENT OF ERROR NO. 4:**

> ***The prosecutor permitted the false testimony of two co-defendants, Andre Porter and Dontrez Banks, to be introduced at the trial of this case, in violation of <u>Napue v. Illinois</u>, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959), thereby depriving Appellant of a fair trial.***

In this assignment, defense counsel asserts the State permitted the false testimony of Porter and Banks in violation of *Napue*.[4] Specifically, defense counsel argues that both men testified they were present at the fight, but each denied direct involvement in the altercation, while implicating the others. Moreover, defense counsel argues that each man's testimony not only contradicts the other's, their testimony also contradicts the facts submitted, without objection, during their guilty pleas. Thus, defense counsel argues the State knew the

---

[4] In *State v. Everett*, 11-714, p. 46 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 636, *writs denied*, 12-1593, 12-1610 (La. 2/8/13), 108 So.3d 77, the court explained:

> To prove a *Napue* claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. *State v. Broadway*, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814. Furthermore, fundamental fairness, *i.e.*, due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269, 79 S.Ct. 1173. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *See Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the granting of a new trial based upon a *Napue* violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir.1997).

testimony was false and still presented it to the jury, depriving Defendant of a fair trial. However, because the defense failed to object to the testimony of Porter and Banks, we find any alleged error has been waived. La.Code Crim.P. art. 841; *State v. Blank*, 16-213 (La. 5/13/16), 192 So.3d 93.

We turn now to Defendant's pro se assignments of error. Notably, Defendant, in his second assignment, challenges the sufficiency of the evidence. Generally, we address sufficiency errors first because if there is merit to a defendant's claim, he or she would be entitled to an acquittal and the remaining assignments of error would be moot. *State v. Hearold*, 603 So.2d 731 (La.1992). Thus, we will address this assignment out of turn and then continue our discussion of errors in numerical order.

**PRO SE ASSIGNMENT OF ERROR NO. 2:**

> ***There was insufficient evidence to convict petitioner of murder during the distribution of illegal drugs.***

Under well-established jurisprudence, the constitutional standard for analyzing the sufficiency of the evidence is whether any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *see also State v. Shupp*, 15-695 (La.App. 3 Cir. 2/3/16), 185 So.3d 900. As we noted previously, the State indicted Defendant on June 2, 2011, with first degree murder, a violation of La.R.S. 14:30. On August 10, 2015, just prior to trial, the State amended its the indictment to a violation of La.R.S. 14:30(A)(1) and (A)(6).

Louisiana Revised Statutes 14:30 provides, in pertinent part:

A. First degree murder is the killing of a human being:

(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted

35

perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated or first degree rape, forcible or second degree rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

. . . .

(6) When the offender has the specific intent to kill or to inflict great bodily harm while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance listed in Schedules I, II, III, IV, or V of the Uniform Controlled Dangerous Substances Law.

Relevant herein, the jury instruction given by the trial court provided, in part:

Thus, in order to convict the defendant of first degree murder, you must find: (1) that the defendant killed Jason Perry; and (2) that the defendant acted with specific intent to kill or inflict great bodily harm; and (3) and either the defendant was engaged in the commission or attempted commission of armed robbery, second degree robbery, or simple robbery; or the distribution, exchange, sale, purchase, or any attempt thereof of a controlled dangerous substance.

Like the unamended indictment, the verdict form only provided for the charge of first degree murder without specifying any enumerated circumstances. The jury returned a verdict of guilty of first degree murder on August 15, 2015.

Defendant now argues the State failed to prove he was engaged in a drug transaction, asserting that (1) at the time of the murder, there was no evidence Defendant engaged in any such drug transaction with the victim, and (2) the State did not attempt to prove Defendant was engaged in a drug transaction. Consequently, Defendant argues, the record evidence, viewed in a light most favorable to the State, is insufficient to reasonably permit a finding that Defendant was engaged in a drug transaction at the time of the subject homicide. Accordingly, he asserts the State failed to prove Defendant's guilt of "every" essential element of the crime charged as required under *Jackson*.

Pursuant to the explicit language of La.R.S. 14:30, the legislature defines "first degree murder as the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm under certain circumstances enumerated in the statute." *State v. Thomas*, 427 So.2d 428, 432 (La.1982). Therefore, it follows that, "in order to convict an offender under this statute, the state must prove one of the enumerated circumstances in addition to specific intent to kill or to inflict great bodily harm." *Id.* In this case, along with specific intent to kill or to inflict great bodily harm, which Defendant has not challenged, the State, pursuant to the amended indictment, had to prove either armed robbery or the drug transaction.[5]

Notably, Defendant, through his attorney, filed a post-trial Motion in Arrest of Judgment, asserting several grounds relevant to our discussion herein:

4.

The Defendant is charged in Count 1 of said indictment with the offense of First Degree murder in violation of R.S. 14:30 (A) (1) and (6).

5.

The Defendant is charged in Count 3 of said indictment with the offense of armed robbery in violation of R.S. 14:64.

6.

The indictment and information contained in discovery indicates [sic] the charges are based on the same alleged conduct.

7.

Each crime does not require proof of an element that the other does not. Armed Robbery is a lesser included offense of 1st degree murder and respectively serves as the basis and underlying offense for the murder charge. As such, satisfaction of all elements of 1st degree murder, under the fact pattern in this case, necessarily satisfies all

---

[5] Although our review only focuses on armed robbery in light of the jury's verdict, the trial, as we previously quoted, also instructed the jury on second degree robbery and simple robbery per La.R.S. 14:30(A)(1).

elements of armed robbery. Only 1st degree murder requires proof of an additional element or elements than that of armed robbery, to-wit: the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. Thus, to permit punishment under both count 1, 1st degree murder, and count 3, armed robbery, subjects defendant to jeopardy of being punished multiple times for the same alleged conduct and constitutes double jeopardy in violation of the United States Constitution, Fifth Amendment, Louisiana Constitution, Article I, Section 15, and Louisiana Code of Criminal Procedure, Article 596.

8.

Trial was held from August 10, 2015 through August 15, 2015 and the Jury returned a verdict of guilty on counts 1, 2 and 3 of the aforementioned indictment, thereby punishing Mr. Griffin multiple times for the same alleged conduct and placing him in double jeopardy in violation of the United States Constitution, Fifth Amendment, Louisiana Constitution, Article I, Section 15, and Louisiana Code of Criminal Procedure, Article 596.

The trial court granted the motion and dismissed the armed robbery conviction on the grounds of double jeopardy.

Because the State only had to prove either armed robbery or the drug transaction, and Defendant was granted his double jeopardy motion based upon the armed robbery as one of the enumerated circumstances used to prove first degree murder, we need only review the record, in accordance with *Jackson*, to determine if the State proved the armed robbery. If there was sufficient evidence to support the armed robbery as an enumerated circumstance, there was no need for the State to also prove a drug transaction under La.R.S. 14:30(A)(6).

The elements of armed robbery are "(1) a taking, (2) of anything of value, (3) from the person or in the immediate control of another, (4) by the use of force or intimidation, (5) while armed with a dangerous weapon." *Shupp*, 185 So.3d at 919. Under the law of principals,

[t]he state may prove a defendant guilty by showing that he served as a principal to the crime by aiding another. *State v. Scroggins*, 40,746 (La.App.2d Cir.3/22/06), 926 So.2d 64, *writ denied*, 06-0980 (La.11/3/06), 940 So.2d 655. Under this theory, the defendant need not actually take anything to be found guilty of the crime. *Id.*; *State v.*

38

> *Dominick*, 354 So.2d 1316 (La.1978).  Also, a defendant convicted as
> a principal need not have personally held a weapon to be guilty of
> armed robbery.  *State v. Watson*, 397 So.2d 1337 (La.1981), *cert.
> denied*, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981). A
> person, who aids and abets another in a crime, is liable just as the
> person who directly commits it.  *Id.*  A critical inquiry in robbery
> cases involving principals is whether or not the alleged principal had
> knowledge that the crime was going to take place. *Id.*

*State v. Womack*, 47,639, pp. 9-10 (La.App. 2 Cir. 1/16/13), 109 So.3d 418, 424,

*writ denied*, 13-304 (La. 9/20/13), 123 So.3d 163.

During the trial, the cassette tapes and transcripts of the recordings of

Defendant's statements given to police on April 14 and 15, 2011 were admitted

into evidence. The State played those recordings for the jury and gave a copy of

each transcript to the jurors.

As we noted previously, in the statement given to police on April 14, 2011,

Defendant stated that he, Porter, and Banks went to the victim's home to "get"

weed or hydro-marijuana. Later in the statement, Defendant clarified it was to

"rob" the victim of the marijuana.[6]  Upon arriving at the victim's residence, an

altercation with the victim began, and Defendant, along with the other two men,

took everything out of the victim's pockets. Defendant denied using any weapon.

As the three fled the scene, he recalled seeing Porter throw the victim's cell phone

out of the car window.

In his April 15, 2011 statement given to police, Defendant again admitted

that he and his friends, Porter and Banks, planned to steal an ounce of hydro-

marijuana from the victim.  Once at the victim's residence, an altercation broke out

between Defendant and the victim. Defendant admitted he was carrying brass

---

[6] Because the evidence shows Defendant, Porter, and Banks also took the victim's cell
phone and wallet, which contained money, clearly items that fall within the definition of
"anything of value[,]" we do not have to rely on their having also taken the victim's marijuana,
an illegal substance, to satisfy that element of the offense. Nevertheless, see *State v. Boelyn*, 432
So.2d 260, 262 (La.1983), which held that "funds, even if obtained from illegal drug sales and
not reported as income, clearly fell within the definition of 'anything of value'."

knuckles, which had a knife protruding from it. He also stated the group took the victim's phone, weed, and wallet. Defendant further recalled Porter and Banks spilt the marijuana between themselves.

At trial, Porter testified that he drove Defendant and Banks to the victim's residence the night of the offense. He recalled an altercation between the three of them and the victim. After the fight, the three returned to his vehicle, and he drove away. While in the vehicle, Porter noticed that Defendant had brass knuckles, with a blade attached, and that the blade was bloody. Additionally, he recalled, after leaving the scene, while in the car, Defendant had the victim's cell phone.

During trial, Banks testified that, on the night of the offense, he rode with Defendant and Porter to the victim's residence. He recalled that, once they arrived and exited the vehicle, a fight ensued between Defendant and the victim. Banks testified he believed Defendant was stabbing the victim, but explained he did not see Defendant with a knife until the three were back in the vehicle, driving away from the victim's residence. Banks described the weapon to the jury as brass knuckles with a blade off the end of it. He stated that Defendant was the only one with a weapon. Although he testified that Porter joined in the fight and "went in [the victim's] pockets," Banks explained that Porter was not armed with any kind of weapon. According to Banks, Porter said he got the victim's phone and wallet. Additionally, Banks recalled seeing the victim's phone and wallet in the vehicle as they were leaving the victim's residence. He testified Porter and Defendant split the money found in the victim's wallet. After the incident, Banks saw Defendant and Porter split the weed taken from the victim, a known "dope dealer."

Without a doubt, Porter, Banks, and Defendant all stated that Defendant, while armed, took part in the robbery of the victim. Even excluding the drugs, the testimony reflected the group took the victim's cell phone and wallet, which

40

contained money. Thus, viewing the evidence in a light most favorable to the prosecution, we find a trier of fact could conclude the State presented sufficient evidence that Defendant was engaged in armed robbery at the time of the murder.

Because there is sufficient evidence to support the armed robbery as an enumerated circumstance of La.R.S. 14:30, there is no need for us to address whether or not sufficient evidence was presented to prove Defendant was engaged in a drug transaction during the murder. Accordingly, we find this assignment of error lacks merit.

## PRO SE ASSIGNMENT OF ERROR NO. 1:

***The trial court's instruction to the jurors on the definition of first degree murder was a constructive amendment of the indictment.***

In his first assignment, Defendant argues the trial court "constructively amended" the indictment when it instructed the jurors they could convict him of first degree murder by finding the killing occurred during the armed robbery or during the "distribution of illegal drugs."

As noted earlier, Defendant filed a pro se motion to quash the indictment in the trial court. In the motion, he complained the indictment failed to set forth specific allegations regarding the first degree murder charge. As a result, in open court, the State amended the bill of indictment to include sections (A)(1) and (A)(6) of La.R.S. 14:30, after which Defendant's attorney stated, in pertinent part:

> Your Honor, that matter is clear. Your Honor, we've submitted the motion to the Court. Basically, you know, it's our contention that the original indictment was defective. At this time, however, it's been amended, it specifically laid out the elements. Obviously, I'll never object to more specificity in an indictment, but at this point I think the Court just has to analyze whether it's proper according to law. If it is the motion can be denied and if it's not the motion can be granted from here.

> BY THE COURT:

41

I'm going to deny the motion to quash. The State has amended the Bill of Information (sic) to address any potential issues that were brought by the motion to quash.

First, we acknowledge that "[w]hen an indictment is amended, unless a defendant moves for a continuance on the ground that he is prejudiced thereby and requires additional time to prepare his defense, he cannot later contend that he was prejudiced by the amendment." *State v. Williams*, 347 So.2d 184, 186 (La.1977); *see also State v. Lafleur*, 13-1082 (La.App. 3 Cir. 3/5/14), 134 So.3d 167. Because the defense did not request a continuance, Defendant has waived review of any defect in the amendment itself.

As to the trial court's constructive amendment, Defendant argues in pertinent part:

> The trial judge's use of the disjunctive conjunction "or" allow [sic] the jurors to find appellant guilty of first degree murder, where there may have been evidence adequate to rest a guilty verdict, pursuant to either sections (1) 'or' section (6) of the first degree murder statute, relieved the state of it's [sic] burden of proving appellant's guilt of every essential element of the crime he was charged with. In re Winship, 397 U.S. 358, 364 (1970) ("the prosecution has the burden of production on every element of the offense charged. If the (prosecution) fails to produce sufficient evidence for any element thereby not bringing the fact into issue, the judge may direct a verdict in the defendant's favor"). See Lafave, Criminal Law § 1. 8 (5[th] ed. 2010); McCormick, Evidence § § 336-337 (6[th] ed. 2006).

Although the trial court's instruction, which is set forth above, provided two alternatives as to the enumerated circumstances, Defendant cites no cases in support of his assertion the trial court erred in doing so. To the contrary, in *State v. Johnson*, 541 So.2d 818, 827 (La.1989), the supreme court explained: "In every homicide case, the prosecutor is free to attempt to establish that the defendant's conduct satisfied any or all of the definitions of first degree murder[.]" Moreover, "[a] jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternative theories." *State v. Seals*, 09-1089,

p. 81 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, 346, *writ denied*, 12-293 (La. 10/26/12), 99 So.3d 53, *cert. denied*, ___ U.S. ___, 133 S.Ct. 2796 (2013). Accordingly, we find Defendant fails to establish how the trial court's jury instruction was improper or how it relieved the State from its burden of proof. This assignment of error also lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 3:**

> ***Appellant was denied his right to a complete defense when the trial court sustained the state's objection to appellant's trial counsel's cross examination of the state's witness[es] as to their admissions of guilt during guilty plea trials***

In this assignment, Defendant argues he was denied the right to a complete defense when the trial court sustained the State's objection to defense counsel's cross-examination of the State's witnesses as to their admissions of guilt during their guilty plea proceedings. Specifically, Defendant asserts his attorney wanted to show the co-defendants had the same culpability as he did; thus, he argues that he should have been found guilty of manslaughter like they were. Defendant contends the trial court improperly limited cross-examination of the co-defendants and violated his right to confront and cross-examine the witnesses against him.

However, Defendant fails to specify which objections at trial he is referring to and does not include page references. Uniform Rules—Courts of Appeal, Rule 2-12.4 provides a brief shall include a suitable reference by page number to the place in the record that contains the basis for the alleged error. *See State v. Rouser*, 14-613 (La.App. 4 Cir. 1/7/15), 158 So.3d 860; *State v. Lewis*, 09-846 (La.App. 3 Cir. 4/7/10), 33 So.3d 1046, *writ denied*, 10-967 (La. 11/24/10), 50 So.3d 825.

Furthermore, the record reflects Defendant confronted and cross-examined both of the co-defendants.[7] Accordingly, we deny this assignment of error.

**PRO SE ASSIGNMENT OF ERROR NO. 4:**

> *Appellant has been denied [h]is right to appeal where the court refuses to provide appellant with copies of voir dire transcripts.*

In his original brief, Defendant complained he requested, from this court, the voir dire transcript to be supplemented based upon a possible *Batson* issue.[8] Additionally, Defendant filed a motion in this court requesting supplementation of the record.

In support of his assertion that he needed the voir dire transcript, Defendant set forth the following allegations and assertions:

> After the following strikes by the state, appellant was left with an all white petiti [sic] jury. Perspective [sic] juror number five (5) Mr. Ancheta, Nasstaani, Kawi,k [sic] was struck by the State for no expressed reason, other than the fact that he is [A]sian and knows appellant. Perspective [sic] jurors number sixty[-]one (61) Ms. Porche, Teri Lunett; and member two hundred [and] twenty[-]two (222) Ms. Wisner, Angela Ann are both female African Americans, were struck by the State for a simple hardship issue which could easily have been resolved, by adjourning court before night fall, despite their indicating that they could judge the law and facts on this case and return a verdict consistent with their sworn duty.

> Perspective [sic] juror number twenty[-]nine (29) Mr. David Lee Brown, the only African American male remaining, was struck by the state for only the reason that the juror expressed a desire to not serve.

> There is a possible Batson violation on this record, but there is little or no way for appellant to demonstrate the unreasonableness of the states [sic] strikes with respect to these four (4) perspective [sic]

---

[7] At trial, co-defendants, Porter and Banks, testified they pleaded guilty to manslaughter. Both were cross-examined about their pleas. Additionally, a copy of the transcript of the guilty plea proceedings was introduced into the record. Defense counsel read the factual basis set forth by the State at the guilty plea proceedings into the record. In the recitation of the factual basis for both co-defendants, Defendant's attorney stated, "a fight ensued involving all parties, . . . as a result of that the victim, Mr. Perry, died as a result of that altercation."

[8] In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), the Supreme Court forbade racial discrimination by use of peremptory challenges during jury selection.

jurors, in compares [sic] with others who actually served, without the transcripts.

Perspective [sic] juror number sixty[-]nine (69) on Patricia N Farris said that she was in school with the victim, that she didn't know what appellant and the victim got into it about, but he, the victim was always real sweet, and she couldn't understand how this could happen to someone so sweet, and that as a result that she couldn't bring back a just verdict. Ms. Farris said all of this in the presence of the perspective [sic] juror's [sic] without any curative instructions from the court.

An out of court hearing was held, involving three other perspective [sic] jurors who were said to have voiced bias [sic] opinions about the case, and against appellant. Perspective [sic] jurors numbers 140, 119, and 129; Aleta Moss, Lavenda Ke[a]tts, Wanda Liliedahl were only told by the judge to not speak or comment on anything going on in the court room.

Despite Ms. Lavenda [K]eatts involvement in the questionable behavior, she was seated as juror number two (2) in this case.

. . . . "the appellate court should only reverse a ruling where a reviewing of the entire voir dire reveals that the trial court abused its discretion." State v. Odenbaugh, 10-0268, p. 24 (La.12/6/11), 82 So.3d 215, 237. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted all of his peremptory challenges." Id.

Thus, "to establish reversible error warranting reversal of a conviction and sentence, a defendant must demonstrate (1) erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges." Id. (quoting State v. Robertson, 92 2660 p. 4 (La. 1/14/94), 630 So.2d 1278, 1284.

This appeal court is bound by law that it "... should only reverse a ruling where a review of the entire voir dire reveals that the trial court abused its discretion."

The entire voir dire transcript are [sic] missing in this case as such, appellant is being denied full review of a substantial portion of his trial record for errors[]. State v. Landry, supra entitling him to reversal of his conviction. La. Const. Art. 1 § 19; La. C.Cr. P. Art. 843.

On November 14, 2016, we ordered the record supplemented with the voir dire transcript and issued additional briefing notices following receipt of the

supplemental record.  Both Defendant and the State submitted supplemental briefs to this court, which we will address *infra* in the supplemental assignment section.

**PRO SE ASSIGNMENT OF ERROR NO. 5:**

> *Appellant suffered ineffective assistance of trial counsel under two separate theorys [sic]. . . :*
>
> > *a) trial counsel's failure to seek a mistrial or maintain an objection to the court proceeding to trial with a petit[] jury tainted by predisposed comments of appellant's guilt was ineffective assistance of counsel; and*
> >
> > *b) [c]ounsel's failure to object to the erroneous jury instruction was ineffective assistance of counsel.*

In this assignment, Defendant contends his attorney was ineffective.  To prove his attorney was, in fact, ineffective, Defendant must show (1) his attorney was deficient, and (2) he suffered prejudice because of this deficiency.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).  As this court has explained:

> The Sixth Amendment of the U.S. Constitution provides a defendant with assistance of counsel for his or her defense.  *See also* La. Const. art. 1, § 13.  According to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant seeking to establish ineffective assistance of counsel must prove that 1) the defense attorney's performance was deficient *and* that 2) the deficiency prejudiced the outcome of the trial.
>
> With regard to the question of whether the defense attorney's performance was deficient, "defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance."  *State v. James*, 95-962, p. 5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465, citing *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) and *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.
>
> Additionally, the defendant must demonstrate that the deficient assistance of counsel prejudiced his defense.  *State v. Jones*, 33,657 (La.App. 2 Cir. 8/23/00), 765 So.2d 1191, *writ denied*, 00-2779 (La.6/29/01), 794 So.2d 825.  In short, the errors must have been so serious as to deprive the defendant of a fair trial. *Id*., citing *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.  It is not sufficient for a defendant to show that the complained-of error had some conceivable effect on the trial's outcome.  *Id*. Rather, the defendant is required to establish that, but for the error, "there is a reasonable probability the outcome of the

trial would have been different." *Id*. at 1199. *See also State v. Truehill*, 09-1546 (La.App. 3 Cir. 6/2/10), 38 So.3d 1246.

*State v. Walton*, 11-1085, pp. 6-7 (La.App. 3 Cir. 4/4/12), 87 So.3d 328, 332-33, *writ denied*, 12-875 (La. 10/26/12), 99 So.3d 639.

Our courts have recognized that claims for ineffective assistance of counsel are more properly raised in applications for post-conviction relief, thus enabling the trial court to order a full evidentiary hearing. *State v. Burkhalter*, 428 So.2d 449 (La.1983); *State v. Seiss*, 428 So.2d 444 (La.1983). Nevertheless, we have also found that, "where the record contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue should be considered." *State v. Dugas*, 96-49, p. 11 (La.App. 3 Cir. 10/9/96), 683 So.2d 1253, 1259, *writ denied*, 96-2652 (La. 4/4/97), 692 So.2d 417.

First, Defendant argues his attorney failed to seek a mistrial or to make an objection based on the grounds that the petit jury was tainted by predisposed comments of his guilt.[9] Without benefit of the voir dire transcript, however, Defendant, in his initial briefing, failed to specify which jurors he is referring to

---

[9] Specifically, Defendant alleges "some of the member [sic] of the petit[] jury had formed a predisposed verdict of guilt in this case, and had discussed their belief with other jurors, one of whom ended up serving on the jury, prejudiced him to a disadvantage." Moreover, he complains:

> After a brief hearing, per counsel's request, the Court admonished the jurors that they were not to discuss the case among themselves. Obviously, the judge was much too late with this instruction. Coupled with the fact that perhaps there was nothing that the judge could do to change the jurors [sic] minds about what they believed or didn't believe at that point, the judge, in fact, did nothing, made no attempts to addressing [sic] the actual prejudicial remarks that were overheard being said by some of the perspective [sic] jurors, and nor did appellant's attorney object to the Court's actions and inactions. Had appellant's attorneys moved the court for a mistrial, where it became obvious that one juror who was questioned by the judge during the mini-hearing changed her story twice and even then maintained a lie about what she said; [i]f what she claims she said is compared against what the court officer says that she overheard, there's a reasonable probability that the outcome of the trial would have been different, as there are strong indications that some of the jurors were out to convict appellant, and were willing to lie under oath, in their efforts to ensure themselves a place on the jury while others may have been willing to lie to cover up the fact that they clearly overheard all of the prejudicial comments.

47

and what specifically the jurors allegedly said that was prejudicial. In his supplemental filings, Defendant fleshes out his voir dire claims, and therefore, we defer discussion of these insufficiency issues at this point, finding it preferable to address them in our discussion of Defendant's supplemental assignment *infra*.

Second, Defendant contends his attorney was ineffective for failing to object to the trial court's instruction that he committed the homicide "while in the perpetration of an armed robbery 'and' the distribution of illegal drugs." Again, Defendant contends the State failed to provide any evidence of "distribution of drugs by appellant." The record before this court is sufficient to review this issue.

As noted above, the jury instruction given by the trial court set forth the elements the jury had to find to convict Defendant of first degree murder, *i.e.*, Defendant killed Perry with specific intent to kill or inflict great bodily harm while Defendant "was engaged in the commission or attempted commission of armed robbery, second degree robbery, or simple robbery, or the distribution, exchange, sale, purchase, or any attempt thereof of a controlled dangerous substance." Louisiana Code of Criminal Procedure Article 802 provides the trial court shall charge the jury as to the law applicable to the case. As noted in our discussion of Defendant's second pro se assignment of error, the State is free to attempt to establish Defendant's conduct satisfied any or all of the definitions of first degree murder, and a jury can be instructed as to alternative theories. *Johnson*, 541 So.2d 818; *Seals*, 83 So.3d 285. Thus, Defendant fails to prove how his attorney was deficient in failing to object to the jury instruction. Accordingly, we find this assignment of error is meritless.

In his pro se supplemental brief, Defendant again raises the issue of his trial counsel's ineffectiveness. We turn now to his assignment of error raised therein.

**SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR:**

48

***Petitioner's Trial Counsel rendered him ineffective Assistance
at Trial when he[:] (1) failed to object to the entire voir dire
proceedings; (2) failed to seek a mistrial after hearing a perspective
[sic] juror taint the entire jury pool with prejudicial opinions of
guilt; (3) failed to request individual questioning of perspective [sic]
jurors during voir; and (4) failed to object to the systematic
exclusion of all of the blacks from his jury.***

In his first two arguments, Defendant again asserts his attorney failed to

object to the entire voir dire proceedings or move for a mistrial when a prospective

juror tainted the entire jury pool. Adding to the allegations advanced in his fifth pro

se assignment of error, Defendant claims:

> See Trial Transcript, pages 10 through 26 for a complete and
> detailed account of all of the events leading up to, and involving the
> questioning of perspective [sic] jurors, Moss, Keatts and Liliedahl in a
> mini hearing about their conversations about their beliefs of
> Petitioner's guilt of the crime charged, and how they lied in their
> efforts to avoid possible sanctions for their misconduct.

> Attorney Micheal Antoon, and Office Administrator, Ms.
> Jennifer Prewitt, both went on record testifying that they had
> overheard..[sic] "a lot of talk among the jurors about Petitioner's
> guilt."

> One perspective [sic] juror, "Aleta Moss #140, was warned
> twice to stop her talk and she refused and kept talking."

> Ms. Prewitt testified at length about who and what she heard.
> Ms. Prewitt in fact testified to overhearing the exact same prejudicial
> comments that Attorney Antoon heard, Ms. Prewitt testified that she
> heard the following. "Why are 'we' here, that he was, you know, it
> was [a] waste of time, he was guilty, 'they' didn't understand why he
> wasn't shackled to the table, do you see him looking around, he's
> trying to figure out how he can escape."

> Despite being clearly overheard by Attorney Antoon and his
> assistant, Ms. Prewitt, when questioned by Attn. Antoon as to if she
> had made any comments about guilt or innocence, Moss denied doing
> so[] and went on trying to downplay her obvious guilt by admitting
> her involvement in the conversations in question, but claiming that
> she only expressed a curiosity of why wasn't Petitioner in shackles.

> Also despite this chain of events, Petitioner's defense attorney
> Vamvoras went along with the State's attorney [sic] wish to not even
> question the other two perspective [sic] jurors as to their degree of
> involvement in their obvious efforts to contaminate the jury pool with
> unsubstantiated prejudicial opinions.

49

The mini hearing was concluded by all of the attorneys and the Court concluding [sic] that this matter would be addressed during the actual voir dire proceedings. (Citations omitted).

Defendant urges juror Keatts lied when she told the trial court she did not hear anyone talk about it being a waste of time to try Defendant because he was guilty. Additionally, he notes potential juror Liliedahl denied hearing the prejudicial comments, although she was in the area when they were said.

Defendant further argues the trial court erred in questioning Moss, Keatts, and Liliedahl in front of the other jurors, explaining:

It was clearly an abuse of the Court[']s discretion for the Court to permit all of the jurors to be questioned in a group as to what, if anything was overheard, Moss, Keatts, and Liliedahl discussing regarding this (first degree murder) capital case. No one wants to called [sic] or seen as as [sic] a rat or snitch in the eyes of others, even if it maybe [sic] the right thing to do.

Snitching frequently results in injuries or death. Some of the jurors, who lived in or near each others [sic] community's [sic] may have feared for their safety. When the Court grouped the jurors together during voir dire, in this case, the Court put a chilling effect on the jurors [sic] decision to be forthright about what they obviously heard Moss, Keatts, and Liliedahl discussing.

He concludes his attorney was ineffective for failing to file a motion to quash, object, or seek a mistrial for the tainted jury.

In response, the State explains that Defendant's attorney and the State both questioned jurors "prior to seating them to determine whether they could decide the case based on the evidence that would be presented." The State asserts Defendant had a fair jury, and the jury found him guilty based upon the evidence. Further, the State argues Defendant failed to provide any evidence that the jury was improperly drawn and asserts there was no ineffective assistance of counsel.

Pursuant to La.Code Crim.P. art. 775, a mistrial must be granted, on motion of the defense, when "prejudicial conduct in or outside the courtroom makes it

50

impossible for the defendant to obtain a fair trial[.]" *See also State v. Surratt*, 05-1406 (La.App. 3 Cir. 6/7/06), 932 So.2d 736, *writs denied*, 06-2100, 06-2102 (La. 6/1/07), 957 So.2d 165. However, such a drastic remedy is warranted only when "the defendant has suffered substantial prejudice such that he cannot receive a fair trial." *State v. Wessinger*, 98-1234, p. 24 (La. 5/28/99), 736 So.2d 162, 183, *cert. denied*, 528 U.S. 1050, 120 S.Ct. 589 (1999); *see also State v. Bates*, 495 So.2d 1262 (La.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1986 (1987).

Potential juror Prewitt, an office administrator for the Public Defender's Office, testified outside the presence of the prospective jurors regarding disconcerting statements she had heard from some of the potential jurors. She recalled hearing some of the potential jurors discussing "why we were here, that he was, you know, it was a waste of time, he was guilty, they didn't understand why he wasn't shackled and chained to the table, do you see him looking around, he's trying to figure out how he can escape." Based upon Prewitt's testimony, the attorneys questioned several potential jurors about the statements.

The attorneys also questioned potential juror Moss outside the presence of the prospective jurors, and the following pertinent exchange occurred between Moss and the defense:

> Q. Thank you very much. Do you recall hearing any comments this morning with regard to Mr. Griffin or the defense in general that were cast in a negative light said by other jurors or by yourself, perhaps?
>
> A. My main comment for the entire day was that everything's going so slowly and I'm just frustrated and tired.
>
> Q. Okay.
>
> A. And I expressed this opinion to the lady sitting beside me.
>
> Q. Okay. Is there anything else that comes to mind that you may have said or that you may have heard with regard to Mr. Griffin specifically or the defense?

A. Not to the defense, you know.

Q. Okay, okay.

A. Let me - -

Q. Sure.

A. - - add this comment, when I heard - - the major main defense lawyer's name I just said, he must be from out of town or something to that effect.

The trial court also questioned Moss:

BY THE COURT:

Q. Anything about wearing shackles or not shackled?

A. Yes, I did say something - - we were in the court and there were very few people here and the defendant was looking around the room, I said, I wonder if he's shackled to the table or something to that effect. I did say that, yes, sir.

BY THE COURT:

Okay.

A. With no malice intended, I was just wondering, you know. There were just very few people in the court at that time and he was there by himself and all the lawyers were all gone, you know. There was nothing personal, just wondering if he was somehow confined to that table, you know.

The minute entry and the transcript do not indicate Moss was seated as a juror.

Juror Keatts was questioned in the presence of the prospective jury panel. She recalled one of the ladies from the jury panel expressed her concern that Defendant was not being monitored when everyone was out of the courtroom or if Defendant was handcuffed or shackled. Keatts did not recall any comments about Defendant's guilt. When asked by one of the Defendant's attorneys, "Do you think . . . that the jury selection process is a waste of time and that we should just find Mr. Griffin guilty and go forward?" she responded, "No, it's a valuable process." Juror Keatts was also questioned about whether she would feel pressured to find

52

Defendant guilty because of her relationship with her friends and relatives who worked at the sheriff's office. She responded her relationships would not sway her. Additionally, juror Keatts indicated she could find Defendant guilty of a lesser charge. Ultimately, she was sworn in as a juror.

Also in the presence of other prospective jury members, potential juror Liliedahl denied hearing any conversation about Defendant not being shackled and being in the area where the conversation allegedly took place. Liliedahl was excused by a peremptory challenge used by Defendant's attorney, and she did not serve as a juror.

Although Keatts and Liliedahl were questioned in front of the other jurors regarding comments made by a potential juror about Defendant, Defendant fails to prove what prejudice, if any, he suffered. Keatts, who served as a juror, indicated she could be fair to Defendant. Liliedahl indicated she did not hear any negative comments about Defendant, and she did not serve on the jury. Furthermore, the record indicates neither Moss nor Prewitt served on the jury. Thus, we find Defendant fails to prove his attorney erred when he did not to object to the entire voir dire proceedings or move for a mistrial based upon the allegation of a tainted jury pool.

Next, Defendant argues his attorney failed to request individual questioning of the prospective jurors during voir dire in this "special circumstances case[,]" which requires "individualized sequestered voir dire." He explains the special circumstance was that "a large number of perspective [sic] jurors were in fact exposed to repeated, highly prejudicial, predisposed opinions of Petitioner's guilt."

The State responds there is no requirement or right for individual questioning; thus, there was no error by defense counsel.

In support of his claim that his counsel should have questioned the jurors individually, Defendant cites *State v. Comeaux*, 514 So.2d 84, 88 (La.1987), in which the supreme court held:

> There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. The manner in which the veniremen are called and the scope of examination are left to the court's discretion. La.Code Crim.P. art. 784; *Id.*, Comment (c); La.Code Crim.P. art. 786; *State v. Kirkpatrick*, 443 So.2d 546 (La.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); *State v. Willie*, 410 So.2d 1019 (La.1982), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984). The burden is on the defendant to show that the court abused its discretion in refusing to sequester the venire at voir dire. *Kirkpatrick*, *supra*. A trial court has the discretion to permit individual voir dire if a defendant can demonstrate that special circumstances are present. La.Code Crim.P. art. 3; *State v. Lindsey*, 404 So.2d 466 (La.1981). Absent special circumstances, the trial court does not err in refusing requests for individual voir dire. The fact that defendant's case is capital does not by virtue of that fact alone establish a "special circumstance" requiring a variation from the general rule of trial court discretion. *State v. Wingo*, 457 So.2d 1159 (La.1984), *cert. denied*, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985).

However, as noted above, Defendant failed to prove he suffered any prejudice by the alleged improper statements made or heard by Moss, Keatts, and Liliedahl. Keatts, the only one who served on the jury, was questioned by the Defendant's attorney and indicated she could be fair. Thus, we find Defendant failed to prove individual sequestration was required and so failed to prove his attorney was ineffective for failing to request it.

Defendant then asserts his attorney failed to object "to the systematic exclusion of all of the blacks from his jury[,]" arguing:

> First, it was decided by the Court that a complete group of (12) twelve persons would be called for voir dire examination.

> Second, it was decided by the Courts [sic] that the Court would wait until all but the last perspective [sic] juror was tentatively seated before any challenges or strikes would be used.

Of the entire groups, of 12, 7, 4 and 4 of perspective [sic] jurors called on voir dire, in this case, only two were black, Mr. Donald Rock and Ms. Teri L. Porche.

Instead of the Court excusing Mr. Rock when he excused the first thirty[-]four (34) perspective [sic] jurors, the Court waited until he was conducting voir dire of his first (12) twelve perspective [sic] jurors, to do so.

The remaining perspective [sic] jurors were all available for viewing by the Court and prosecutor(s), as such, they knew that only one perspective [sic] black juror remained.

This one black female, perspective [sic] juror, Ms. Porche was called among the second group of seven (7) perspective [sic] jurors for voir dire examination. Much like Mr. Rock, the other black perspective [sic] juror that the Court excused upon his request; the Court also had been asked by Ms. Porche to be excused for only the reason that she needed to timely pick up her grandchildren.[10] (Citations omitted).

Defendant claims the State requested a peremptory strike of Porche, without stating a race neutral reason, and sought to keep Keatts instead. He contends that, had Porche been kept on the jury, he would have been found not guilty because the empanelled jury returned an eleven-to-one verdict.

A review of the voir dire transcript indicates the State did make a peremptory challenge to Porche. The State pointed out Porche expressed that she did not want to serve and that she had problems with her grandchildren, which was a "neutral reason for her challenge." It further explained the trial court had denied a challenge for cause. Defense counsel responded that he desired the record to reflect Porche was an African-American female. However, counsel did not object or make a *Batson* challenge.

Although Defendant states the race of the potential jurors in his briefs to this court, the record does not reflect the race of any of the jurors except Porche. Furthermore, the racial make-up of the jury was not set forth on the record, and the

---

[10] The defense released potential juror Rock for cause based on a medical hardship.

record does not reflect that the defense raised either an objection or a *Batson* challenge during or at the conclusion of voir dire.

In *State ex rel. Sparkman v. State*, 15-1726 (La. 10/17/16), 202 So.3d 488, the defendant, on post-conviction, sought review of his trial counsel's ineffectiveness in failing to object to racial discrimination during jury section. In a per curiam opinion, the supreme court found the defendant failed to prove his claim, citing *Strickland*. Additionally, the supreme court adopted the district court's written reasons for denying the defendant's application, which provided, in pertinent part:

> In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the use of peremptory challenges to exclude persons from a jury based on their race violates the Constitution's Equal Protection Clause. The Louisiana legislature passed LSA-C.Cr.P. art. 795(C) which prohibits the use of peremptory challenges based solely on race or gender. There are a number of steps that must each be proven in order to prevail on a *Batson* claim.
>
> In addition to the high burden of proving counsel was ineffective, the court also finds the petitioner's reliance on *Batson* misplaced. To prevail on a *Batson* claim, it must be proven that the peremptory challenges on race or gender were in fact made, if so, the prosecutor is given an opportunity to state a race-neutral reason for the strike. If the prosecutor fails to do so, the trial court must decide if the defendant met his burden of proving intentional racial discrimination. See *State v. Green*, 655 So.2d 272, 287 (La. 1995).
>
> None of the necessary steps were proven in this case. The record establishes that the petitioner was represented at trial by an experienced criminal defense attorney, Marquita Naquin. As counsel for the petitioner, it was her duty to raise issues before and during the trial, if she believed them to be well-founded. In addition, in his memorandum, the petitioner asserts four black jurors were struck, demonstrating discrimination. However, within the record, there is no reflection of the race of any prospective or actual jurors.
>
> For these reasons, the petitioner has not made a valid *Batson* claim or a valid claim that one should have been raised. There is nothing in this record to cause this court to substitute its judgment for defense counsel's judgment during trial or on appeal. In fact, it appears trial and appellate counsel performed well in their representation of the petitioner, despite overwhelming evidence.

*Sparkman*, 202 So.3d at 491-92.

As in *Sparkman*, the record in this case establishes Defendant was represented at trial by experienced criminal defense attorneys. Additionally, although Defendant claims the State purposefully discriminated against black jurors, the record only reflects the race of one of the prospective jurors, Porche. Furthermore, as noted above, when the State made a peremptory challenge to Porche, one of Defendant's attorneys noted for the record Porche's race, and the State explained Porche expressed that (1) she did not want to serve and (2) she had problems with her grandchildren—race neutral reasons. The defense made no objection after the State gave a race neutral reason for the prospective juror's dismissal. Accordingly, pursuant to *Sparkman*, we find nothing in this record that would cause this court to substitute its judgment for defense counsel's judgment during voir dire. This assignment of error likewise lacks merit.

## DECREE

For the reasons discussed above, Defendant's convictions and sentences for the first degree murder of Jason Perry and for conspiracy to commit armed robbery of Jason Perry are affirmed.

**AFFIRMED.**